## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **GLADYS TORRES-CORREA,** | |
| *Plaintiff*, | |
| **v.** | Civ. No. 23-cv-1025 (MAJ) |
| **INSTITUTO DE OJOS Y PIEL, INC., et al.,** | |
| *Defendants*. | |

## OPINION AND ORDER

### I.    Introduction

This medical malpractice action is brought by Gladys Torres-Correa ("Plaintiff") against Instituto de Ojos y Piel, Inc. and Dr. Miguel Santiago García, along with several unnamed insurers. ("Defendants"). (**ECF No. 1**). After undergoing ophthalmic surgery performed by Defendants, Plaintiff allegedly developed a series of complications. (**ECF No. 1 at 2 ¶¶ 6–13**). Plaintiff claims that those complications were caused by Defendants' negligence. (**ECF No. 1 at 2 ¶ 14**). To prove her claims, Plaintiff intends to introduce at trial the expert witness testimony of Dr. José A. Rodríguez Robles ("Dr. Rodríguez"). (**ECF No. 53 at 23**).

Defendants move the Court to rule the proffered testimony of Dr. Rodríguez inadmissible. (**ECF No. 57**). Plaintiff filed responses to Defendants' motion, (**ECF No. 63, 64**),[1] Defendants replied, (**ECF No. 65, 66**), and Plaintiff filed a sur-reply. (**ECF**

---

[1] On April 30, 2025, Defendants filed two motions in limine relating to the prospective testimony of Dr. Rodriguez. (**ECF No. 57, 58**). In the first of those motions – the focus of the instant Opinion and Order – Defendants argue that the testimony of Dr. Rodriguez should be ruled inadmissible due to his lack of qualifications and the unreliability of his expert report. (**ECF No. 57**). In the second motion, Defendants

No. 67). For the reasons provided below, Defendants' motion to exclude the testimony of Dr. Rodríguez is **GRANTED**.

## II.    Background

Plaintiff suffers from glaucoma and cataracts. (**ECF No. 1 at 1–2 ¶ 5**); (**ECF No. 9 at 2 ¶ 5**). To treat those conditions, on May 12, 2020, Plaintiff underwent ophthalmic surgery in her left eye. (**ECF No. 1 at 1–2 ¶ 5**); (**ECF No. 9 at 2 ¶ 5**). The surgery was performed by Defendant Dr. Miguel Santiago García at Instituto de Ojos y Piel. (**ECF No. 1 at 1–2 ¶¶ 5, 7, 8**); (**ECF No. 9 at 2 ¶¶ 5, 7, 8**); (**ECF No. 53 at 17 ¶ 1**).

After the surgery, Plaintiff developed complications in her eye. (**ECF No. 53 at 3, 8**). In November 2020, she was diagnosed with "Complicated Cat [S]urgery OS with Corneal Scarring, Sphincter Damage Leaving Fixed Enlarged Pupil." (**ECF No. 1 at 2 ¶ 13**); (**ECF No. 9 at 3 ¶ 13**). On January 20, 2023, Plaintiff filed the Complaint, alleging that Defendants were negligent in the diagnosis, treatment, and post-operative care of her condition. (**ECF No. 1 at 2 ¶ 14**). Plaintiff seeks two million dollars in damages. (**ECF No. 1 at 4 ¶ 24**).

Plaintiff retained Dr. Rodríguez as an expert witness. (**ECF No. 53 at 23**). Dr. Rodríguez is a neurologist. (**ECF No. 53 at 23**). Plaintiff proffers that Dr. Rodríguez will testify as to the "treatment provided to [Plaintiff] at Instituto de Ojos y Piel, . . . the applicable standards of care[,] . . . causation between the treatment provided . . . and the damages alleged[,] . . . [as well as] the opinions [of] Defendant's expert." (**ECF No. 53 at 23–24**). On March 13, 2022, Dr. Rodríguez prepared a report analyzing the events of this

---

argued that Dr. Rodriguez should be prohibited from testifying as to the opinions of Defendants' expert. (**ECF No. 58**). On June 2, 2025, Plaintiff filed responses to those motions. (**ECF No. 63, 64**). Each filing states that it was filed in response to ECF No. 58. Although the Court lacks clarity on which brief was intended to respond to ECF No. 57, the Court will consider each of Plaintiff's filings.

case. (**ECF No. 57-1**).[2] On June 28, 2024, Dr. Rodríguez was deposed by Defendants. (**ECF No. 57-2**).[3] On February 20, 2025, Plaintiff produced to Defendants a second report prepared by Dr. Rodríguez. (**ECF No. 58-3**); (**ECF No. 58 at 4**) (collectively "the Reports").[4] In the Reports, Dr. Rodríguez concludes that Plaintiff suffered "permanent damage of the left cornea" as a result of "medical malpractice", (**ECF No. 57-1 at 2**), and that Defendants' alleged failure to "ensure adequate post-operative follow-up" worsened her condition. (**ECF No. 58-3 at 2**).

On May 20, 2025, Defendants filed the instant motion, requesting that the Court rule the proffered testimony of Dr. Rodríguez inadmissible. (**ECF No. 57**). Defendants provide four reasons for this request. First, Defendants argue that Dr. Rodríguez is unqualified to offer expert opinions regarding the medical issues in this case, given that he is not an ophthalmologist, has no formal training in the field, and has never performed the surgeries Plaintiff received in this case. (**ECF No. 57 at 3**). Second, Defendants assert that Dr. Rodríguez has failed to adequately describe what he believes to be the applicable standard of care in this case. (**ECF No. 57 at 2–3**). Third, Defendants contend that Dr.

---

[2]  An identical copy of the first report was filed at ECF 58-1. For consistency, the Court will cite only to 57-1 throughout this Opinion and Order.

[3]  When addressing the substance of Dr. Rodríguez's expert opinion, the Court has also looked to his deposition testimony and treated that testimony as if it were included in the Reports. "Generally, Rule 26 does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony[.]" *Sandoval v. Hosp. Oriente, Inc.*, 770 F. Supp. 3d 412, 423 (D.P.R. 2025) (citations omitted). Yet exceptions to this general rule exist. *See, e.g. Vargas-Alicea v. Cont'l Cas. Co.*, Civ. No. 15-1941, 2020 WL 3470325 (D.P.R. June 25, 2020) (considering deposition testimony where "Defendants deposed [the expert] in connection with his report and elicited responses that reasonably filled the report's gaps as to standard of care, deviation, and causation," after assessing whether such testimony was an unfair surprise or prejudicial to defendants). Because the Court finds that all testimony from Dr. Rodríguez is excludable on other grounds, the Court declines to specifically address whether the deposition testimony in this case is admissible. For the purposes of this Opinion and Order the Court assumes, without deciding, that the deposition testimony may be considered.

[4]  An identical copy of the second report was filed at ECF 64-2. For consistency, the Court will cite only to 58-3 throughout this Opinion and Order. The Court notes that it is not clear from the face of the second report whether that document was intended to serve as either a supplement or as a substitute to the original report. (**ECF No. 58-3**). For the avoidance of doubt, the Court has considered the contents of both reports.

Rodríguez's proffered testimony regarding causation is wholly conclusory and "outcome driven[.]" (**ECF No. 57 at 10**). Finally, Defendants assert that "Dr. Rodríguez's report and his deposition testimony are devoid of any clinical evidence, specific findings or medical literature to support" his opinion. (**ECF No. 57 at 10**).

### III.    The Expert Opinion

In the first report, Dr. Rodríguez articulated his medical opinion as follows:

> The intraocular surgery that was performed in this patient over the left eye provoke a permanent damage of the left cornea between others. The medical doctor stays away of the adequate standard of care in this case. Patient now is pending for heroic surgical procedure without any kind of guarantee to recover her vision in the left eye. The procedure will be on schedule for April 06, 2022. The iatrogenically induced complication on the left cataract surgery provoke the cornea decompensation that can be prevented (avoided) by physician if proper precautions are taken to avoid corneal failure. This patient will require corneal transplantation as heroic measure in order to try to recovery the vision by the left eye.

(**ECF No. 57-1 at 2**). In the first report, Dr. Rodríguez also listed the medical records he reviewed, described Plaintiff's then-current symptoms, provided a diagnosis of Plaintiff's condition, and made general reference to three scientific publications. (**ECF No. 57-1 at 1−3**). At no point did the first report ever attempt to define the "adequate standard of care" or the "proper precautions" that Dr. Rodríguez believed were not observed by Defendants.

At his deposition, Defendants' counsel directly asked Dr. Rodríguez: "What is the adequate standard of care in this case?" (**ECF No. 64-1 at 116:5−6**). Dr. Rodríguez responded: "The adequate standard of care in this case, is that you need to be certain when you do this kind of surgery." (**ECF No. 64-1 at 116:7−9**). After the question was posed again, Dr. Rodríguez elaborated further:

Okay. The other standard of care in this case, is that the physician needed to be very careful to avoid iatrogenic —due to the procedure, of the physician procedure— iatrogenic corneal stroma injury that creates that the membrane... descemet membrane becomes broken and causes corneal edema, blindness or severe pain. All the stuff that she had, you can do that with the instrument, with the insertion of the instrument, when you are doing the surgery. If you take the... specifically an area in the interior chamber that provokes that the descemet membrane be broken and always, or most of the time, that's a very operator-dependent complication of the procedure. And you need to avoid that, because if you have this injury or this trauma in the patient, you can have all the medical complications that patient had. Insertion of the cannula, when you insert the cannula... It's very, very, very... It's not a... Let me see how can I explain that. It's a complication. It's a complication of the procedure, but it's not expected to be. It's operator-dependent and you can avoid that with your expertise and with your surgical technique. You can avoid that, and you need to prevent that. Because if you have that, you then need to manage this patient in another way, with another treatment. Descemetopexy, you need to do that, to try to . . . You need to do descemetopexy to restore the broken area. And if you do it, the patient has a good a probability to recover completely in the next month.

(**ECF No. 64-1 at 116:24−118:9**). Defendants' counsel then asked Dr. Rodríguez, "What evidence do you have that, in this particular case, corneal edema was physician-induced?" (**ECF No. 64-1 at 118:10−11**). Dr. Rodríguez responded:

Because of the clinical picture of the patient. She had all the symptoms, all the clinical picture, that this has a problem with the descemet membrane of the cornea. That's the history and clinical picture. History and medical picture, that provoked that descemet membrane injury. There is no other explanation, that this patient had any other thing that provoked nearly blindness, blurred vision, strenghtful (*sic*) pain, corneal edema. And it's well documented in the medical literature that this is an iatrogenic traumatic complication, most of the time of the procedure, of the technique.

(**ECF No. 64-1 at 118:12−24**). Dr. Rodríguez then acknowledged that such complications sometimes occur even where the surgeon uses a proper technique. (**ECF No. 64-1 at 118:21 − 119:11**).

Defendants' counsel then cited to the portion of the first report in which Dr. Rodríguez stated that the surgical complication could have been avoided had "proper precautions" been taken to avoid corneal failure. (**ECF No. 64-1 at 120:1−6**). "What are those precautions?", Defendants' counsel asked. (**ECF No. 64-1 at 120:7**). Dr. Rodríguez responded as follows:

> When you introduce the technique with the instruments, you need to avoid to decompensate the cornea, that is the name of the issue. When you have the descemet membrane decompensation, it's the same as corneal decompensation. Okay? And the proper precaution that you need to take is when you introduce the instrument with your technique, that we're supposed to do a good, excellent physician technique to avoid that with the instrument and don't penetrate the corneal stroma. Because if you penetrate the corneal stroma and take the membrane, you can produce this pathology.

(**ECF No. 64-1 at 120:8−19**). Moments later, Defendants' counsel sought more detail on the alleged negligence committed by Defendants when operating on Plaintiff, asking Dr. Rodríguez whether it was his opinion that Dr. Santiago García "did not use a correct surgical technique" when operating on Plaintiff. Dr. Rodríguez answered, "No, I don't say that." (**ECF No. 64-1 at 124:16−19**). He continued:

> The technique could be correct, but the instrument manipulation, the human factor, the use of the technique, that will be the expert in the use of the technique, that not necessarily... You can operate many patients with this technique and everything is okay. But specifically in one (1) case, you have problem with the approach with the technique, in terms of the instrument, you can have problems.

(**ECF No. 64-1 at 125:2−10**). It was "[n]ot the technique itself," Dr. Rodríguez clarified, but "the technique used in [the] wrong fashion" that allegedly caused Plaintiff to suffer post-operative complications. (**ECF No. 64-1 at 125:12−13**). Still unsatisfied, Defendants counsel inquired further: "What, in your opinion, is the correct technique or approach in this case?" (**ECF No. 64-1 at 125:24−126:2**). Dr. Rodríguez continued:

> You can use this technique, but you need to be careful not to harm the stroma of the cornea. You know, if you hurt the stroma of the cornea and the membrane, you will have a problem like this. If you don't hurt it, you don't have problems, with the same technique.

(**ECF No. 64-1 at 126:3−8**). "When you're careful, you can avoid to hurt the stroma[,]" Dr. Rodríguez summarized. (**ECF 64-1 at 127:1−2**).

Dr. Rodríguez never went further to describe in any detail what, in his opinion, was the actual cause of Plaintiff's injuries. After opining again that the surgeon's technique was flawed in some unspecified way, (**ECF No. 64-1 at 129:10**), Dr. Rodríguez was asked again, "So what did the doctor have to do to avoid stromal edema . . . in your opinion?" (**ECF No. 64-1 at 129:14−16**). Without elaborating further, Dr. Rodríguez responded: "Be careful." (**ECF No. 64-1 at 129:17**).[5]

According to Defendants, Plaintiff produced a second report prepared by Dr. Rodríguez on February 20, 2025. (**ECF No. 58-3**); (**ECF No. 58 at 4**). The second report provided the following additional information:

> The combination of glaucoma and cataract surgery increases the risk of complications, particularly corneal edema, which can necessitate a corneal transplant if not properly managed . . . In the case of this female patient with glaucoma, the corneal complication leading to vision loss resulted from the following factors:
>
> 1. The iatrogenic complication caused by the cataract surgery led to corneal decompensation, which could have been prevented had proper precautions been taken.
> 2. The surgeon had a duty to ensure adequate post-operative follow-up, particularly for an elderly patient at high risk of complications.

---

[5]    The Court identified these portions of the deposition transcript in part with the aid of Defendants' Motion in Limine, which extensively excerpts relevant portions of the deposition of Dr. Rodriguez. *See, e.g.,* (**ECF No. 57 at 2−7**). Plaintiff, on the other hand, never once cites to the deposition in any of her responsive briefs, much less to any specific portion of the deposition not cited to by Defendants. *See generally* (**ECF No. 63, 64, 67**). The Court notes that the Local Rules for the District of Puerto Rico require that all written opposition memoranda "include citations, supporting authorities, affidavits and other documents setting forth or evidencing facts on which the objection is based." *See* Local Rule 7(b).

3. Failure to make reasonable efforts, such as contacting the patient, arranging transportation, or conducting follow-up visits, raises concerns about whether the standard of care was met.

4. Given the patient's advanced age and the severity of the complication, a more proactive approach to follow-up care was warranted to prevent adverse outcomes.

5. Failure to diagnose and properly treat the patient's ophthalmological condition post-surgery further contributed to the deterioration of her vision.

Cataract surgery in glaucoma patients requires meticulous [intraocular pressure] management. If post-operative [intraocular pressure] is not carefully controlled, it can exacerbate optic nerve damage, worsening the patient's glaucoma and leading to corneal complications such as edema or endothelial dysfunction. These issues can result in severe visual impairment, potentially necessitating a corneal transplant if the damage is permanent. Any deviation from the standard of care such as improper [intraocular pressure] management or inadequate follow-up can significantly increase the likelihood of such adverse outcomes.

(**ECF No. 58-3 at 1–2**). The second report also summarizes information contained in the first report, (**ECF No. 58-3 at 1**), and includes citations to ten legal and scientific references that Dr. Rodríguez consulted in forming his opinion, three of which were also included in the first report. (**ECF No. 58-3 at 2–3**).[6] At no point, however, does either report ever attempt to explain how the opinion of Dr. Rodríguez was informed by or related to any of the referenced scholarship. *See generally* (**ECF No. 57-1**); (**ECF No. 58-3**).

## IV.    Analysis

Puerto Rico law provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31

---

[6]    In addition to the ten sources referenced above, the second report also makes reference to four legal cases related to cataract surgery, glaucoma, and medical malpractice, (**ECF No. 58-3 at 3**). Because expert witnesses are not permitted to testify to a legal conclusion, *see, e.g., Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 101–102 (1st Cir. 1997), and because none of the cases referenced in the second report are binding authority, the Court does not directly address those legal citations in this Opinion.

L.P.R.A. § 10801.[7] "Within this rubric, three elements coalesce to make up a prima facie case for medical malpractice . . . a plaintiff must establish [1] the duty owed, [2] the occurrence of an act or omission constituting a breach of that duty, and [3] a sufficient causal nexus between the breach and some resultant harm." *Martínez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 285 (1st Cir. 2009).

In medical malpractice cases, establishing the minimum standard of care owed by a physician to a patient usually requires the assistance of an expert. *Rivera Rodríguez v. Quality Health Servs. of P.R.*, Civ. No. 18-1287, 2022 WL 3445348, at *3 (D.P.R. Aug. 4, 2022) (citing *Cortés Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 190 (1st Cir. 1997)). Likewise, it is well-established that, "in a medical malpractice case under Puerto Rico law[,] a factfinder normally cannot find causation without the assistance of expert testimony." *Martinez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 286 (1st Cir. 2009) (noting that expert testimony is ordinarily required to establish causation because in medical malpractice cases "the issues tend to be scientifically driven and more nuanced than in most tort cases") (citations and quotations omitted). Against this backdrop, Plaintiff seeks to admit the expert witness testimony of Dr. Rodríguez.

Federal Rule of Evidence 702 provides that a qualified expert may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

---

[7]        "Article 1802 of the Puerto Rico Civil Code of 1930, Puerto Rico's previous tort statute, was replaced by Article 1536 when the new Puerto Rico Civil Code was enacted in November 2020. However, Articles 1802 and 1536 have provisions that are extremely similar and thus can be used interchangeably. Courts in this district accordingly apply caselaw analyzing Article 1802 to claims arising under Article 1536." *Forde v. Concho Corp.*, Civ. No. 23-01052, 2025 WL 320683, at *3 n.3 (D.P.R. Jan. 28, 2025) (quotations and citations omitted).

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Before a party may admit testimony from a retained expert witness, however, Rule 26 of the Federal Rules of Civil Procedure requires that the party submit a written report containing, in relevant part, "a complete statement of all opinions the witness will express and the basis and reasons for them[,]" as well as "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B). Where a party fails to comply with the mandatory disclosure requirements of Rule 26(a) and their failure was not "substantially justified or . . . harmless[,]" that "party is not allowed to use that information or witness to supply evidence . . . at a trial[.]" Fed. R. Civ. P. 37(c)(1).[8] The admissibility of expert witness testimony is thus contingent upon whether the parties "make explicit and detailed expert disclosures" that demonstrate the reliability and rigor of the proffered opinion. *Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este*, 456 F.3d 272, 276 (1st Cir. 2006); *see also Clemente-Vizcarrondo v. United States*, Civ. No. 17-1144, 2020 WL 748840, at *2 (D.P.R. Feb. 14, 2020); *Rivera-Marrero v. Presbyterian Cmty. Hosp.*, 255 F. Supp. 3d 290, 296 (D.P.R. 2017) ("[E]xpert-related disclosures are insufficient when they consist of sketchy and vague descriptions of anticipated opinions or areas of anticipated testimony.") (quotations omitted).

To determine whether the testimony proffered in an expert witness report is admissible, the trial judge performs a "gatekeeping function" by ensuring that the

---

[8]     The Court notes that Rule 26 also requires that every expert report – unless otherwise stipulated or ordered by the court – include "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition" as well as "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(v)–(vi). The Reports do not comply with this mandate. (**ECF No. 57-1**); (**ECF No. 58-3**). The Court declines to address this issue, however, both because Defendants do not move for exclusion of the proffered testimony on this ground, and because the proffered testimony is inadmissible on other grounds.

proffered expert testimony satisfies the admissibility criteria of Federal Rule of Evidence 702. *United States v. Sepulveda*, 15 F.3d 1161, 1183 (1st Cir. 1993); *Pages-Ramírez v. Ramírez-González*, 605 F.3d 109, 113 (1st Cir. 2010). This requires the Court to determine whether the expert's "scientific, technical, or other specialized knowledge . . . will assist the trier better to understand a fact in issue[,]" as well as to "ensure that [their] testimony both rests on a reliable foundation and is relevant to the task at hand." *Pages-Ramírez*, 605 F.3d at 113 (quotations and citations omitted); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (providing that under Federal Rule of Evidence 702 "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"). This is a "flexible inquiry" that requires the Court to gauge the "overall reliability" of a proffered expert witness testimony as well as its "special relevancy" to the issues to be presented to the jury:

> Along with the reliability requirement, the *Daubert* Court imposed a special relevancy requirement. To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *Cummings v. Standard Register Co.*, 265 F.3d 56, 64 (1st Cir. 2001) (reliability of expert witness testimony under *Daubert* is contingent upon "whether the proposed testimony . . . rests on a reliable foundation and is relevant to the facts of the case.") (citations omitted). "The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016).

Under Rule 702, the Court must focus on the "principles and methodology" of the proffered expert opinion, "not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "So long as an expert's scientific testimony rests upon good grounds . . . it should

be tested by the adversarial process[.]" *López-Ramírez v. Toledo-González*, 32 F.4th 87, 94 (1st Cir. 2022) (quotations omitted). As the First Circuit has previously explained, "[t]here is an important difference between what is *unreliable* support and what a trier of fact may conclude is *insufficient* support for an expert's conclusion." *Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 15 (1st Cir. 2011). Where the factual basis for an expert opinion is merely "weak" – rather than fundamentally unreliable or irrelevant – the expert's opinion is to be weighed by the jury. *López-Ramírez*, 32 F.4th at 94. On the other hand, the Court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and instead may rule the evidence inadmissible where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Defendants move the Court to rule inadmissible the expert witness testimony of Dr. Rodriguez, arguing that his proffered opinion is fundamentally lacking in reliability and relevance. (**ECF No. 57 at 10–12**).[9] Plaintiff opposes the motion. (**ECF No. 63,**

---

[9]       In addition, Defendants argue that Dr. Rodríguez, who has no formal training or experience in ophthalmology, is not "qualified" to provide expert witness testimony in this case. (**ECF No. 57 at 3**). Defendants are correct that Dr. Rodríguez lacks many of the credentials that one would customarily expect from an individual offering an expert opinion on an ophthalmological surgical procedure: as Defendants point out, Dr. Rodríguez has no formal training in ophthalmology, has never performed an ophthalmological surgery, and has never managed post-operative care for a patient who has undergone an ophthalmological procedure. (**ECF No. 57 at 3**); (**ECF No. 64-1 at 30:20–32:16, 53:20–54:16**). Standing alone, however, this does not necessarily render the proffered testimony of Dr. Rodríguez inadmissible. It is well established that "[t]he fact that [a] physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Mitchell v. United States,* 141 F.3d 8, 15 (1st Cir. 1998); *Pages-Ramírez*, 605 F.3d at 116 (holding that district court abused its discretion by excluding expert witness testimony where proffered expert was a specialist in pediatrics and neonatal and perinatal medicine, and the expert was to testify as to a cesarean section performed by an obstetrician-gynecologist); *Gaydar v. Sociedad Instituto Gineco-Quirúrgico Planificación*, 345 F.3d 15, 24 (1st Cir. 2003) (ruling that a district court may not exclude expert witness testimony as unqualified "*on the sole basis* that his medical specialty was something other than" the specialty of the defendant doctor) (emphasis added). Because the Court finds that the proffered testimony of Dr. Rodríguez is inadmissible on distinct grounds, and since "[i]t is not required that experts be 'blue-ribbon practitioners' with optimal qualifications[,]" the Court declines to rule on this issue. *United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006).

**64**).[10] Upon careful consideration of the issues, the Court finds that the proffered testimony of Dr. Rodríguez is not "based on sufficient data . . . or facts" and will not "help the trier of fact to understand the evidence or determine a fact in issue." *Clemente-Vizcarrondo*, 2020 WL 748840, at *5. In reaching this conclusion, the Court finds that the proffered opinion of Dr. Rodríguez is deficient in three ways. First, the Reports fail to articulate an applicable standard of care. Second, the Reports neither explain how Defendants breached any such standard, nor provide a reasoned basis for the conclusion that any such conduct caused Plaintiff's injuries. Third, the Reports fail to explain the methods or data on which Dr. Rodríguez relied in forming his conclusions. Considering these omissions, the Reports fail to "come within a country mile of satisfying the requirements" for expert witness disclosures. *Santiago-Díaz*, 456 F.3d at 276 (concluding that an expert report "consisting of one page . . . does not come within a country mile of satisfying the requirements of . . . the Civil Rules"). Accordingly, the proffered expert witness testimony is not admissible at trial. The Court will address each of these deficiencies in turn.

### i.  Dr. Rodríguez fails to identify the applicable standard of care.

"With respect to a negligence claim that alleges medical malpractice, Puerto Rico holds health care professionals to a national standard of care." *López-Ramírez*, 32 F.4th

---

[10]     Much like the proffered expert witness testimony she intends to admit at trial, Plaintiff's briefing on these issues is entirely conclusory and fails to seriously engage with the factual and legal underpinnings of Defendants' motion. Setting aside the bullet-point style prose that lends the brief a distinctly synthetic quality, *see, e.g.*, (**ECF No. 64 at 7**), certain portions of the brief – for instance, Plaintiff's non-sequitur paragraph on the relationship between "flawed eyewitness testimony" and "wrongful convictions" (**ECF No. 64 at 6**) – leave the Court to speculate whether the brief was actually authored by a human being. More troubling yet, that was only one glaring error in a brief that throughout leaves crucial points of fact and law unaddressed or undeveloped. *See generally United States v. Sevilla-Oyola*, 770 F.3d 1, 13 (1st Cir. 2014) ("Arguments raised in only a perfunctory and undeveloped manner are deemed waived on appeal."). The Court reminds counsel of their obligations of competence and diligence to their clients, as well as their duty of candor towards this tribunal.

at 94 (quotations omitted). Therefore, "rather than simply explaining a standard [of care] . . . based on their own experience," an expert witness in a medical malpractice case must establish that "a standard of care is nationally used[.]" *Sandoval v. Hosp. Oriente, Inc.*, 770 F. Supp. 3d 412, 420 (D.P.R. 2025). To do so, "an expert may: (1) provide evidence of professional discussions about the applicable course of treatment, such as in conventions, meetings or seminars, (2) present relevant data like published protocols and standards, or (3) rely on peer-reviewed literature." *Id.*

Dr. Rodríguez has failed to provide any such evidence of a national standard of care, and Plaintiff openly concedes that fact. (**ECF No. 67 at 5**) (arguing that Dr. Rodríguez's "failure to cite a specific 'national standard' for ophthalmic surgery does not render his opinion inadmissible"). Beyond referring vaguely to a supposed "adequate standard of care" and gesturing to an unspecified set of "proper precautions", the first report filed by Dr. Rodríguez never states what that applicable standard of care is. (**ECF No. 57-1 at 2**). Nor does the report establish that any such standard of care is nationally applicable, much less provide "evidence of professional discussions" at the national level, present "relevant data like published protocols," or "rely on peer-reviewed literature" to support its conclusions. *See Sandoval*, 770 F. Supp. 3d at 427. [11] The same is true of the second report, which, beyond referring in a conclusory fashion to the "standard of care" and the "proper precautions" that allegedly went unheeded by Defendants, never states what those precautions were. (**ECF No. 58-3 at 1–2**). While the second report does speak in greater detail to issues concerning "adequate post-operative follow-up . . . such

---

[11]    As addressed in greater detail below, *see infra* Section IV.B.iv, while the Reports do make general references to ophthalmological scholarship, they never attempt to explain why Dr. Rodríguez relied on that scholarship, why he chose not to engage with other scholarship, which sources supported which conclusions, or whether the cited materials spoke to a prevailing national standard of care at all.

as contacting the patient, arranging transportation, or conducting follow-up visits", it never ties this proposed "more proactive approach to follow-up care" to an existing national standard. (**ECF No. 58-3 at 2**).

The deposition testimony of Dr. Rodríguez does not cure these deficiencies. Wherever Dr. Rodríguez was asked a direct and concrete question regarding the applicable standard of care during the deposition, he failed to articulate the relevant standard in any meaningful detail. *See, e.g.*, (**ECF No. 64-1 at 116:7−9**) ("The adequate standard of care in this case, is that you need to be certain when you do this kind of surgery"); (**ECF No. 64-1 at 117:21−23**) ("It's operator-dependent and you can avoid that with your expertise and with your surgical technique. You can avoid that, and you need to prevent that."). At best, Dr. Rodríguez suggested at one point during the deposition that the applicable standard of care required the surgeon performing cataract surgery on Plaintiff to avoid "penetrat[ing] the corneal stroma." (**ECF No. 64-1 at 120:12−19**) ("And the proper precaution that you need to take is when you introduce the instrument with your technique, that we're supposed to do a good, excellent physician technique to avoid that with the instrument and don't penetrate the corneal stroma. Because if you penetrate the corneal stroma and take the membrane, you can produce this pathology"). Moreover, even if these statements did speak to a standard of care, Dr. Rodríguez never claims that it is a *national* standard of care, nor does he provide any evidence that would support that conclusion.

These "analytical gap[s]" implicate the reliability of the proffered expert testimony, as Dr. Rodríguez provides no reasoned or detailed basis for the conclusions adopted in his Reports. *See Joiner*, 522 U.S. at 146; *see also Clemente-Vizcarrondo*, 2020 WL 748840, at *5 (excluding proffered expert opinion as "unreliable" because the report

contained a "lack of support" for the "proffered opinion on the standard of care"). Furthermore, the absence of any reliable opinion testimony regarding the applicable standard of care also compromises the relevance of the proffered testimony. *See Lopez-Concepcion v. Caribe Physicians Plaza Corp.*, Civ. No. 21-1360, 2024 WL 3691840, at *9 (D.P.R. Aug. 7, 2024) (holding proffered expert testimony inadmissible in part for failure to "identify a national standard of care" or describe how the defendant did or did not adhere to any such standard); *cf. Dachman v. Maestre-Grau*, Civ. No. 18-1421, 2022 WL 16757592, at *3–5 (D.P.R. Nov. 8, 2022) (admitting expert testimony because the expert identified the standard of care and supported their conclusions with data). General statements that doctors should "be careful," (**ECF No. 64-1 at 129:17**), "be certain," (**ECF No. 64-1 at 116:7–9**), or use a "good, excellent physician technique," (**ECF No. 64-1 at 120:12–19**), do nothing to assist the trier of fact in assessing the specific standard of care that a surgeon should have observed when performing the procedure. *See Ruiz-Troche*, 161 F.3d at 81 ("To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue.").

### ii. Dr. Rodríguez fails to provide support for the conclusion that Defendants deviated from an applicable standard of care, or that any such deviation caused Plaintiff's injuries.

Even if Dr. Rodríguez had articulated an applicable standard of care, the proffered testimony still fails to provide a reasoned basis for the conclusion that Defendants breached any such applicable standard of care. In Puerto Rico, the "law presumes that physicians exercise the reasonable level of care" and plaintiffs must carry "the burden of

refuting this presumption." *López-Ramírez*, 32 F.4th at 94. Therefore, under Puerto Rico law, to establish breach of duty and causation in a medical malpractice case, an expert must rely on more than a "res ipsa loquitur" theory of breach. *López-Ramírez*, 32 F.4th at 95. In other words, the mere fact that a patient sustains an injury is not alone enough to establish breach of duty or causation: under Puerto Rico law, "negligence cannot be assumed simply because a patient suffered an injury or treatment was not successful." *López Ramírez v. Grupo Hima San Pablo, Inc.*, Civ. No. 16-3192, 2020 WL 365554, at *5 (D.P.R. Jan. 22, 2020) (explaining that, in a medical malpractice action arising under Puerto Rico law, "proffered [expert] testimony that consists solely of a res ipsa loquitur opinion would lack the reliable methodology and specialized information required by Fed. R. Evid. 702").[12]

In characterizing the opinion of Dr. Rodríguez as "outcome driven, as opposed to causation driven," Defendants argue that Dr. Rodríguez improperly relied on the mere fact that Plaintiff sustained an injury to reach the conclusion that Defendants were negligent. (**ECF No. 57 at 10**). The Court agrees. The opinion proffered by Dr. Rodríguez is entirely conclusory, as he fails to provide any substantive explanation of the "proper procedures" or the preferred surgical "technique" that allegedly went unheeded by Defendants. *See, e.g.*, (**ECF No. 57-1 at 2**); (**ECF No. 64-1 at 120−127**). Nor does he ever explain how any such unstated acts or omissions caused Plaintiff to experience post-operative complications. Moreover, none of the responsive briefs filed by Plaintiff even attempt to identify a specific portion of the record that would establish otherwise. *See,*

---

[12]    The Court notes that here, as in *López Ramírez*, the parties do not dispute that Res Ipsa Loquitur "is a theory of negligence that . . . is not one the plaintiffs may rely upon under Puerto Rico law." *López Ramírez*, 32 F.4th at 95; (**ECF No. 64 at 3−4**).

*e.g.*, (**ECF No. 64 at 3−4**) (concluding without further explanation that "Dr. Rodríguez's opinions are not based solely on the occurrence of an injury but are supported by his analysis of the surgical technique and the specific complications that arose").

When urged during the deposition to cite any evidence supporting the conclusion that Plaintiff's injuries were caused by Defendants' negligence, Dr. Rodríguez explained that his opinion was simply based on the fact that Plaintiff had sustained injuries:

> Because of the clinical picture of the patient. She had all the symptoms, all the clinical picture, that this has a problem with the descemet membrane of the cornea. That's the history and clinical picture. History and medical picture, that provoked that descemet membrane injury. There is no other explanation, that this patient had any other thing that provoked nearly blindness, blurred vision, strenghtful (sic) pain, corneal edema.  And it's well documented in the medical literature that this is an iatrogenic traumatic complication, most of the time of the procedure, of the technique.

(**ECF No. 64-1 at 118:12−24**). However, by indicating that Plaintiff's injuries could have occurred even in the absence of any negligence, Dr. Rodríguez deposition testimony appears to undermine his own conclusory opinion that Defendants must have been negligent. *See, e.g.,* (**ECF No. 64-1 at 119:1−11; 126:16−20; 127:8−11; 128:7−11; 128:23−129:17**). More generally, the conclusion that Defendants negligently caused Plaintiffs injuries lacks verifiable support: the only information offered by Dr. Rodriguez to establish negligence is a summary of Plaintiff's symptoms after the operation. Since that alone is not enough to overcome the presumption "that physicians exercise the reasonable level of care[,]" the Court finds that the Reports are effectively silent as to breach and causation. *López-Ramírez*, 32 F.4th at 94. As with the absence of any helpful proffered testimony regarding the applicable standard of care, the Court concludes that the absence of any reasoned or detailed opinion regarding breach or causation compromises the reliability and relevance of the proffered opinion.

### iii.    Dr. Rodríguez fails to explain his methodology or provide adequate data to support his opinions.

In performing its gatekeeping function, the Court must determine whether the proffered expert opinion is "supported by an accepted methodology that is based on substantial scientific, technical, or other specialized knowledge." *Clemente-Vizcarrondo*, 2020 WL 748840, at \*2. The Court will not admit expert testimony that lacks "good grounds": the admissibility of expert witness testimony is contingent upon whether the expert establishes "a valid scientific connection" between the data on which they have relied and the "pertinent inquiry" at issue in the case. *Daubert*, 509 U.S. at 591–592. This requires the Court to look to "several factors: the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community." *Ruiz-Troche*, 161 F.3d at 80–81. Ultimately, the Court must "ensure that proposed expert testimony imparts scientific knowledge rather than guesswork." *Id.* at 81 (quotations omitted). Where an expert report is not sufficiently explicit and detailed, "a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and may exclude the expert witness on that basis. *Joiner*, 522 U.S. at 146. Indeed, nothing "requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Joiner*, 522 U.S. at 146; *Cf. Maestre-Grau*, 2022 WL 16757592 (admitting expert testimony as reliable and qualified in part based on the fact that the expert identified the standard of care and supported their conclusions with data).

In this case, there is a yawning "analytic gap" between the scientific literature cited by Dr. Rodríguez and the conclusory opinions articulated in his Report. *See Joiner*, 522

U.S. at 146. In the Reports, Dr. Rodríguez makes general reference to eight publications relating to matters of ophthalmology, as well as two publications regarding "legal and ethical issues in medical malpractice[.]" (**ECF No. 58-3 at 2−3**). Yet the Reports never provide any analysis whatsoever to explain the relationship between the sources cited in the Reports and the conclusions drawn by Dr. Rodríguez. None of the conclusions reached by Dr. Rodríguez cite directly to any scientific literature; the sources in question are simply appended to the end of the Reports without any internal citations or further explanation. The Reports never quote any of the cited sources, never summarize their findings, and never describe what, if any, data was drawn from the cited scholarship. *See generally* (**ECF No. 58-3**). To determine whether the citations provide any support for the proffered opinion of Dr. Rodríguez would require pure speculation where, for instance, Dr. Rodríguez makes general reference to a nearly 1000-page textbook without any further explanation of how he relied on that scholarship. (**ECF No. 58-3 at 3**) (citing Kanski JJ, Bowling B. *Kanski's Clinical Ophthalmology: A Systematic Approach*. Elsevier Health Sciences, 2011). Coupled with the fact that the Reports fail to articulate a national standard of care or explain the basis for the conclusion that Defendants were negligent, these "analytical gap[s]" render the Reports fundamentally lacking in relevance and reliability. *See Joiner*, 522 U.S. at 146. As such, the proffered expert testimony of Dr. Rodríguez is inadmissible.

## V.    Conclusion

For the reasons set forth above, the Court finds that the proffered expert witness testimony of Dr. Rodríguez is not reliable and will not assist the trier of fact. Accordingly, Dr. Rodríguez may not present expert witness testimony at trial. If necessary, Defendants shall have until September 10, 2025 to move for summary judgment.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of August, 2025.

<u>**/s/ María Antongiorgi-Jordán**</u>
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**